ELEANOR GALLAGHER *et al.*, Plaintiffs-Appellees, *v.* RECONCO BUILDERS, INC., d/b/a Ridge Construction Company, *et al.*, Defendants-Appellants.—(FEDERAL SAVINGS & LOAN ASSOCIATION OF CHICAGO, Defendant.)

First District (4th Division)    No. 79-2039

Opinion filed December 18, 1980.

Ignaz Kratz, of Chicago, for appellants.

Barry E. Burke, of Molaro & Burke, of Chicago (George S. Pfeifer, of counsel), for appellees.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The plaintiff sued the corporate defendant and its sole stockholder for breach of contract when defendant walked off of a construction job without completing it and after defendant had obtained all of the funds by the submission of false affidavits. The court determined that under the facts of the case the individual stockholder as well as the corporation, which was insolvent, should be held liable. The stockholder has appealed.

We affirm.

In May of 1975, Reconco Builders, Inc. (hereinafter Reconco), acting through its president, Pierre Zucco (hereinafter Zucco), contracted with plaintiff to build for her a two-story addition to her house and to remodel certain rooms in the house. After a major portion of the construction had been completed, and Reconco had been paid the amount agreed upon, Reconco walked off the job when plaintiff refused to pay an additional $5,000. Reconco since then has gone out of business. Plaintiff sued both Reconco and Zucco, alleging that Zucco should be held liable for Reconco's breach because the corporation was obviously undercapitalized; Zucco commingled his funds with those of Reconco; Reconco failed to maintain the required books and records, and Zucco has treated Reconco as a sole proprietorship. Plaintiff further alleged that Zucco submitted inaccurate and incomplete contractor's affidavits to induce Talman Federal Savings and Loan to release funds. (Plaintiff also sued Talman, but this claim has been settled.) After hearing the evidence, the trial court found fraud on the part of Zucco and awarded plaintiff the sum of $5,606 to cover the liens plaintiff had to satisfy, $5,875 for repairs, and $1,800 liquidated damages as agreed upon in the contract.

The only issue before this court is whether the trial court erred in piercing the corporate veil and holding Zucco personally liable. While several witnesses testified as to the amount of damages, the only evidence we need consider is the testimony of the defendant Zucco and the exhibits introduced in connection therewith.

Zucco testified that his primary experience in the building trade was in bidding for jobs. If he sold a job, he would then "sub" the work out. He was not a member of any trade union. Prior to the time he began to do business under the name of Reconco Builders, he had done business under the name Ridge Construction Company. While he claimed that he had filed under the assumed-name act (Ill. Rev. Stat. 1975, ch. 96, pars. 4-8a), for Ridge Construction Company, plaintiff introduced into evidence a statement from the Cook County clerk that there was no filing under the assumed-name act for that company.

Ridge Construction Company was an individual proprietorship. Zucco while doing business under that name banked at the Plaza Drive-in Bank.

After doing business as Ridge Construction Company for about a year Zucco incorporated Reconco. He believed it was in 1972. He was the incorporator. He might have used his wife "as a secretary or something" but he was not sure. He was the sole stockholder. At one point he said he was the sole director; at another, he said he and his wife were directors. He thought he owned 250 shares, but in a discovery deposition he stated

the corporation had issued one hundred shares. He thought the corporation was formed with $1,000. He did not remember where the money came from.

Reconco also had its bank account at Plaza Drive-in Bank. This was the corporation account; it did not contain any of his private funds. Reconco had only one employee (besides Zucco), a secretary, since all jobs were "subbed" out. Zucco and his wife were the only ones authorized to sign checks.

When asked how many corporation meetings he attended, Zucco answered "whenever they had to be." He did not know how many. "There must have been one" in 1975. He did not remember in what season of the year that meeting was held or what business was conducted at that time. Zucco decided whether a job was advantageous to Reconco or not. He did not believe that it was his habit to get any corporate resolutions authorizing him to enter into any contracts to bid for Reconco. He testified that he kept very precise books for the corporation and that he had most of them in his basement. However he did not produce them.

The caption of the proposal submitted to the plaintiff reads: Ridge Construction Company, subsidiary of Reconco Builders, Inc. Zucco testified that this was the normal stationery he was using at the time. Until October the letterhead on subsequent letters sent to plaintiff regarding changes reads: Ridge Construction Co., General Contracting and Alterations. The address below was x'd out and on all but one letter, in smaller print, "Reconco Builders, Inc., 6550 N. Northwest Highway Chicago Illinois 60631" was stamped on the letters below and to the left of the printed letterhead. On none of the letters was the name Ridge Construction Co. x'd or stamped out. All of the letters were signed Reconco Builders Inc., Pierre M. Zucco, Pres. The letters sent in October have no letterhead at all.

Zucco testified that when he entered into the contract in May 1975, business had been slow or he might not have taken the job. He had had two or three jobs in the previous four months, not enough to make it a good business. When he started the job he was low on funds. He might have had a thousand dollars or a little more but he did not know. The corporation did not own any equipment or real estate. His first bid was $41,000 but in a weaker moment he agreed to do the job for $31,000. It was done on the spur of the moment. He thought if he got the right "guys" and could "work it close," he could do it.

He had never done a job exactly like this one. This was the first two-story room addition he had done. Most of his jobs ran from $1,000 to $3,000. He had no credit lines with any banks or other financial institutions so as to enable him to borrow money against the jobs he was doing. He never needed credit lines since the jobs were never that size.

Zucco never drew more than $250 a week from the corporation; some weeks he would draw $100; and a "lot of weeks I wouldn't draw anything." It was set up so that he should draw $250 a week but "it wasn't there."

In order to get funds from Talman Savings which was making payments pursuant to a construction loan obtained by plaintiff, Zucco, as president of Reconco, filled out under oath five contractor's affidavits which were then notarized. In the affidavits he swore that all waivers were there, correct and genuine and delivered unconditionally and that there was no claim either legal or equitable to defeat the validity of the waivers; that the names listed on the affidavits were the names of all persons who had furnished labor or material or both and of all parties having contracts or subcontracts for specific portions of the work and the amounts due or to become due to each of them and that the items mentioned included all labor and material required to complete the work according to plans and specifications. He further swore that there were no other contracts for said work outstanding and that there was nothing due or to become due to any person for material, labor, or other work of any kind done or to be done upon or in connection with the work other than that stated. By filing these affidavits with Talman, Zucco and Reconco were able to receive over $31,000 (the evidence is unclear as to whether it was $31,000 or $33,000). Zucco admitted that not all of the people were paid the amounts listed on the affidavits. Some were and some were not. He also paid other people not shown on the affidavits. He did not pay the suppliers all that was owed. They got part but not all. (These outstanding debts resulted in liens against plaintiff's property.) Zucco stated there would have been a lot more owed if he hadn't taken money from another job and "stuck it in there" (presumably the corporation) instead of "sticking it in his pocket." All the funds he received from Talman he disbursed to workmen, subcontractors and material men.

After Zucco received the last payment from Talman on November 4, 1975, he informed plaintiff that he "was busted out" and could not complete the job unless plaintiff came up with an additional $5,000. Zucco stated that he figured it would take around $3,000 to complete the work but he was going to play it safe. After plaintiff refused to pay the additional amount, defendant quit.

Reconco stopped doing business immediately following plaintiff's job. The corporation was dissolved by the Secretary of State on December 1, 1975, for failure to pay the franchise tax in 1975, thereby terminating its existence. On December 31, 1975, there was $5 in Reconco's bank account.

When asked what the situation was when he spoke to plaintiff, Zucco responded:

"A. I didn't have any money.

Q. Who didn't have any money.

A. I didn't have any money. There was no money in the corporation. I borrowed money from Commercial Credit to the limit. From Local Loan I borrowed money to put into the corporation. I couldn't borrow any more to put in there.

Q. When you say, 'I didn't have any money,' do you refer to the corporation or yourself?

A. I didn't have any money, period. If I drew 250 a week, even, that, it wasn't there. I had gone to the limit to my personal borrowing to put money in the corporation to continue the work I was doing."

■■■ A corporation is a legal entity which exists separate and distinct from its shareholders, officers, and directors, who are not, as a general rule, liable for the corporation's obligations. (*Stap v. Chicago Aces Tennis Team, Inc.* (1978), 63 Ill. App. 3d 23, 379 N.E.2d 1298; *Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 372 N.E.2d 1043.) This is true even though the corporation is a so-called close corporation, one in which the stock is held in a few hands and is not frequently bought and sold. There is no specified or required minimum number of stockholders for a valid corporate existence, and corporations with a single shareholder have received judicial sanction. *Amsted Industries, Inc. v. Pollak Industries, Inc.* (1978), 65 Ill. App. 3d 545, 382 N.E.2d 393.

■■ However, a corporate entity will be disregarded and the veil of limited liability pierced where it would otherwise present an obstacle to the protection of private rights or where the corporation is merely the alter ego or business conduit of a governing or dominating personality. (*People ex rel. Scott of Pintozzi* (1971), 50 Ill. 2d 115, 277 N.E.2d 844; *Central States Southeast & Southwest Areas Pension Fund v. Gaylur Products, Inc.* (1978), 66 Ill. App. 3d 709, 384 N.E.2d 123; *Stap v. Chicago Aces Tennis Team, Inc.* (1978), 63 Ill. App. 3d 23, 379 N.E.2d 1298; *Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 372 N.E.2d 1043; *Bevelheimer v. Gierach* (1975), 33 Ill. App. 3d 988, 339 N.E.2d 299.) For the doctrine traditionally known as the "piercing of the corporate veil" to apply two requirements must be met: first, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and second, circumstances must be such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. *Central States Southeast & Southwest Areas Pension Fund v. Gaylur Products, Inc.* (1978), 66 Ill. App. 3d 709, 384 N.E.2d 123; *Stap v. Chicago Aces Tennis Team, Inc.* (1978), 63 Ill. App. 3d 23, 379 N.E.2d 1298; *Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 372 N.E.2d 1043.

■■ The decision to disregard the corporate entity does not generally rest on a single factor but involves the consideration of many factors such as inadequate capitalization, failure to issue stock, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation at the time, nonfunctioning of other officers or directors, absence of corporate records and whether in fact the corporation is only a mere facade for the operation of the dominant stockholders; in addition, in the absence of fraud, the particular situation must generally present an element of injustice or fundamental unfairness. (1 Fletcher, Cyclopedia of Corporations §41.3 (1974).) A corporation's capitalization is a major consideration in determining whether a legitimate separate corporate entity was maintained. (*Amsted Industries, Inc. v. Pollak Industries, Inc.* (1978), 65 Ill. App. 3d 545, 382 N.E.2d 393; *Stap v. Chicago Aces Tennis Team, Inc.* (1978), 63 Ill. App. 3d 23, 379 N.E.2d 1298.) "An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability." (*Anderson v. Abbot* (1944), 321 U.S. 349, 362, 88 L. Ed. 793, 803, 64 S. Ct. 531, 538.) The rationale for this rule was well explained in *Stap v. Chicago Aces Tennis Team*, when the court quoted from Ballantine on Corporations:

> " 'If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempts to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unincumbered capital reasonably adequate for its. prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.' Ballantine on Corporations 302-03 (rev. ed. 1946)." (63 Ill. App. 3d 23, 28-29.)

Accordingly, undercapitalization, disregard of corporate formalities and the like, coupled with an element of injustice, fraud or fundamental unfairness have been regarded fairly uniformly as constituting a basis for imposition of individual liability. 1 Fletcher, Cyclopedia of Corporations §41.3 (1974).

The trial court in the case at bar was entitled to conclude from the evidence that the corporation was grossly undercapitalized. The amount paid into the corporation when it was incorporated was $1,000, the

minimum required by statute (Ill. Rev. Stat. 1971, ch. 32, par. 157.50), and Zucco testified that at the time the contract between plaintiff and Reconco was signed there might have been a thousand dollars or a little more in the bank. The corporation did not own any equipment or real estate. In light of the fact that Zucco testified that some weeks he would draw from $100 to $250 from the corporation the court was entitled to conclude, in the absence of any evidence from Zucco to the contrary, that by his withdrawals he reduced the stated capital and paid-in surplus below the $1000 minimum required by statute to be maintained for creditors. (Ill. Rev. Stat. 1973, ch. 32, par. 157.60b.) That section provides that no reduction of stated capital or paid-in surplus shall be made under the Act which will reduce the sum of stated capital and paid-in surplus below the amount of $1000. Indeed, reading that section in light of section 60a of the Business Corporation Act (Ill. Rev. Stat. 1973, ch. 32a, par. 157.60a), it appears that such reduction cannot be made even to pay creditors; there can be no doubt that such was done here since Zucco testified that in December 1975 there was $5 in Reconco's bank account.

Even if we ignore the possibility that Zucco reduced the capital below the statutory minimum for his own benefit, it can be concluded from the evidence that Reconco was undercapitalized considering "the nature and magnitude of the corporate undertaking." (*Anderson.*) As already noted, Reconco had only the minimum capitalization required by statute. This meant it had no resources to rely upon should something go wrong. Reconco had never handled a job of this magnitude before. It had no credit lines so as to enable it to borrow against the job. The fact that Reconco had only $1,000 to lose may explain why it was willing to gamble by reducing its bid from $41,000 to $31,000.

In addition, the court was entitled to conclude that Reconco and Zucco did not observe corporate formalities. Zucco admitted there were no corporate resolutions. He claimed there were meetings, but didn't know when or how many. The court was entitled to conclude there were none. Likewise, since Zucco claimed there were corporate books but failed to produce them, the court could conclude that none were kept or that if they were an examination of them would disclose facts adverse to Zucco's claim. *Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 372 N.E.2d 1043.

Other evidence also indicates that Zucco did not regard the corporate entity seriously. His letterheads bore the name of both the corporation and Ridge Construction Co. He did not know how many directors there were or how many shares were issued. From his statement that there would have been a lot more owed if he had not taken money from another job and "stuck it in there" instead of "sticking it in his pocket," one

could conclude that Zucco believed that the money earned on the jobs belonged to him, not the corporation.

■■ There can be no doubt that "some element of unfairness, something akin to fraud or deception" was present. (*Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 324, 372 N.E.2d 1043, 1048.) Zucco obtained money from Talman by falsely swearing under oath on contractor's affidavits. These affidavits are required for the protection of the owner of the property, since if workmen and suppliers are not paid off, liens may be filed against the property. We also note that while Zucco excused his demand of extra funds from the plaintiff on the grounds that he could not continue otherwise since he was "busted out," he did not simply ask plaintiff to pay the costs of completing the work; he demanded substantially more than was needed or he would abandon his contract.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

LINN, P. J., and JOHNSON, J., concur.